All right. This is a time and place for hearing of Gordon v. County of Orange. Mr. Schlesinger, you may proceed. Thank you very much, Judge Woyle. May it please the court. My name is David Schlesinger. I represent the appellant, Mary Gordon. Winston-Anne Lake today is the third anniversary of this court's having issued its published opinion in what I will refer to as Gordon 1. In the months after that, the district court, then in August of 2019, issued an order that once again granted summary judgment in favor of the four individual defendants, this time based on prong two of the Qualified Immunity Doctrine, the clearly established law prompt, and also once again entered summary judgment in favor of Orange County on the Monell Claim. We submit that the district court in so doing made three errors, and I will try to address as many of them as I can within my time before I reserve approximately a minute and a half or two minutes for rebuttal. The first error is that the district court did not conduct the clearly established law inquiry under an objective framework as this court originally established in the state of Ford and then reaffirmed in Horton by Horton, and most recently in the majority opinion three months ago, approximately three months ago in Sandoval, the county of San Diego. It's fairly clear, and I won't spend too much time on this point because I think that the court, based on its pre-argument order, is perhaps more interested in the clearly established law errors that the district court made. But here, this is a patent error that by itself we submit would justify at least vacating the district court's order regarding qualified immunity for the four individual defendants. The second error, and again, as I said, this is the one that it seems the court is most interested based on its pre-argument order and hearing argument regarding, is that under any standard, regardless of whether it were the proper objective standard or if it were a subjective inquiry, the district court erred in determining that the four individual defendants were not on fair notice that their conduct, or in some instances regarding Nurse Finley and Deputy Denny, their lack of conduct violated the due process clause of the 14th She engaged in several acts that, as this court is quite aware from having written about them in the factual section of Gordon 1, that any reasonable nurse at the time would have known to have violated clearly established law. First, she conducted an assessment of Mr. Gordon, Matthew Gordon, under an incorrect sheet for an incorrect protocol, the CWO protocol for alcoholics instead of the COWS protocol for people suffering from opioid addiction. Second, Judge Gonzalez-Rogers. Can I ask you, what is the objective constitutional right that one can glean from those particular facts? I find that plaintiffs tend to want to broadly define constitutional rights over broadly, frequently, and defendants tend to want to narrowly define them. It's our job to look at the facts and to discern what is the heart of the issue that is giving rise to the dispute. What would you say about an objective right that one is entitled to proper medical screening to make sure that there is an appropriate medical protocol introduced? I think it's part and parcel, Your Honor, with proper treatment. In order to have the proper treatment, you need to have the proper screening. And in this case, as Your Honor's opinion in Gordon 1 noted, Ms. Gordon's nursing expert, Ms. Luthi, had opined in a declaration that the assessment form was vital in making sure that everything that followed was proper. For example, being prescribed the correct medications, methadone or suboxone, instead of four medications that simply dealt with the secondary effects of the opioid withdrawal. Second, making sure that he was placed in a proper medical unit for monitoring instead of general population. And third, just generally putting her on heightened notice that she was treating someone with serious opioid addiction problems, heroin addiction problems, that needed to be monitored. And this is why this case is very similar in many respects to Nurse de Guzman's conduct in Sandoval that the majority opinion deemed to violate clearly established law. Nurse de Guzman had for six hours failed to adequately monitor Mr. Sandoval. Here, Nurse Finley, as the record clearly establishes, and I think the opinion in Gordon 1 mentions it, Nurse Finley was on duty until 7 a.m. the following day, shortly before the time that Matthew Gordon was ultimately discharged from the loop process and admitted into his module. So, much like in Sandoval, Yara, getting back to your original question, the assessment process was vital in determining whether Matthew Gordon ultimately was able to receive the correct treatment and the correct placement in a medical unit and to be monitored adequately. Indeed, all Deputy Denny knew was that medical attention was required, but that at least was able to put him on notice that Matthew Gordon required monitoring. And of course, as we discussed at length in our briefing in Gordon 1 and Gordon 2 and the opinion in Gordon 1 adequately addresses this, Deputy Denny was monitoring Matthew Gordon from a completely inadequate, inherently, I would say, an inherently inadequate vantage point. Well, taking that then, how would you, again, objectively speaking, describe the standard? Are we talking about direct view monitoring? Is it only when they're under medical supervision? What is the articulation of the objective standard? The objective standard, Your Honor, is whether a reasonable sheriff's deputy would know that there is a risk of harm to an inmate, whether from, or in this case, a detainee, whether from another detainee or the detainee perhaps harming himself in a long line of cases like Lemire, for example, and Cloutier that involve suicide or being harmed. Are you saying that the monitoring has to be from a vantage point where they what? It has to be from a vantage point where you could see that the detainee is in distress and even detainee, even Deputy Denny noted that from that particular vantage point at that time in September 2013, he couldn't even see whether the detainees were breathing or distressed or even alive. So as I understand this case, that it was medically necessary. It was deemed medically necessary, agreed among the prison guards that monitoring was required. And what you're saying is everybody agrees monitoring is required. It's not adequate to monitor from a place where you can't actually see the defendant. That's absolutely correct, Your Honor. And clearly established law in cases like Lemire, in which the prison officials, the prison deputies, the correctional officers had completely withdrawn from the unit. And therefore there was no monitoring going on at the time that the decedent committed suicide. That's very comparable to Deputy Denny's monitoring from an inherently inadequate location. It's constructively the same as not monitoring at all. May I ask a housekeeping matter? Certainly, Your Honor. I would know that I'd like to try to reserve some time for rebuttal, but I'd be glad to answer. All right, we'll give you a minute or two. Thank you so much. But my question is, in terms of the individual defendants that you are appealing as to, there's only two left, and that's Nurse Finley and Deputy Denny. Those are the two for which there is the most evidence regarding their unconstitutional conduct, Your Honor. We have not officially abandoned the claims against Licensed Vocational Nurse Garcia and Sgt. Tonke. If you'd like, during my remaining time, I could briefly summarize our position regarding those two defendants. Well, why don't we hear from the county, Mr. Harrell first. Thank you, Your Honor. You're muted, Mr. Harrell. You're still muted. Okay, Sam. Okay, there you go. Now you're unmuted. Good morning, Your Honors. These are crazy times. We're all going to get through it. My name is Frank Harrell, and I am here for the county appellees in this case. As the court's aware, the county appellees prevailed in the trial court based on the qualified immunity doctrine. And I think Judge Gonzalez-Rogers raises a good point. How specifically do we define the constitutional right at issue in this case? And the Supreme Court has written extensively about that during the past seven years or so. And my understanding of the law is they expressed a general displeasure with formulation of the right at an extremely abstract level. We heard in opposing counsel's brief in his presentation of this morning that he believes that the right is with regard to the deputy that there needs to be monitoring in a situation like this. The challenge for plaintiff's counsel is the situation like this, the facts before the court are a medical doctor evaluated Mr. Gordon and did not place him in an infirmary or a hospital. He was placed in general housing. The medical doctor is not a defendant in this case. And that's one of the puzzling aspects of the procedural posture of the case is plaintiff's fundamental quarrel to get to Judge Gonzalez-Rogers point when she says, what is the heart of the issue? The heart of the issue is the plaintiffs in this case are complaining that the doctor, Dr. Lee, who is not a defendant, who is not being sued in this case, gave bad instructions to everybody else. He didn't give a good treatment plan to the nurses is their claim. And he housed Mr. Gordon in general housing instead of an infirmary or a hospital. Mr. Harold, Judge Gould, if I could interject questions on that point. My question is, does the record tell us how nurse Finley came up with the wrong protocol to use the alcohol protocol instead of the one for addiction to a drug? Yes, Judge Gould, the record, the summary judgment papers include a declaration from Dr. Lee. And to his credit, he says, this was not the wrong protocol. Once you get past the name, the CEWA protocol that was used is designed to address polysubstance abusers. Mr. Gordon had in the doctor's opinion, based on his training and experience, not just a problem with heroin, but with other substances. So the CEWA protocol is probably named the wrong thing. It probably should be called a polysubstance abuse protocol. And that is what Dr. Lee chose. Nurse Finley didn't choose anything. Dr. Lee, according to Orange County policy, and according to the American Medical Association, this is his responsibility. A nurse can't be prescribing protocols for anybody. And again, Dr. Lee is not. You would then agree that there is this objective, and I'm focused on the objective component, that there is then an objective component or an objective right to a proper medical screening to ensure that we have a medically appropriate protocol. It's just in this case, it was with that? Your Honor, I would agree that that even viewed at from a very abstract and very general level of inmates have a constitutional right to a proper medical screening, even from a very general formulation of the right. And I would also agree that the district court erred in its use of subjectiveness when it did prong to the constitutional assessment. Your Honor, no. I believe that the trial court did what the including Hammer v. Gross and the Horton case said we must look at the law as it existed at the time the nurses were required to act. Are you arguing that Sandoval was wrong? Your Honor, I believe with great respect to Judge Wardlaw that Sandoval should have looked more particularly at the facts that were at issue in that case, and it should have looked at clearly established law that more closely matched the facts of that case. In our case, I can tell you that in this, maybe of some assistance to the court, it's sister court, the 10th Circuit, um, just last year in 2020 had, to my knowledge, the very first circuit court level case that dealt with heroin withdrawal. And they did a comprehensive survey of national law in an effort to find out where is the clearly established law? What have courts told medical providers that they need to or not do when someone comes into their care at a jail? And the 10th Circuit, um, in footnote two, found that there was nothing, not even anything at the circuit court level dealing with instructions to medical staff on what they need to do when they deal with substance abusers. And that brings us to qualified immunity in this case. Able plaintiff's counsel, the 10th Circuit, if there was something out there giving instructions to the medical staff, it would have been cited to this court. And there's nothing to cite because there's nothing there. And I can tell the court too, that as somebody that receives the 9th Circuit opinions, just like all of us do, um, yeah. If the 9th Circuit were to state in this case, this is what we want done with addiction in the 9th Circuit. This is what we want done. Um, I can assure the court that me, people like me, we will get out there and we will tell our wants. And in that case, we have clearly established law and we'll get the training out there just like we do with all 9th Circuit opinions. My understanding is that, um, you, that the, the, the prison actually changed its protocol after the incident in this case, in terms of, um, medical screening. Your Honor, I believe they changed this protocol with regard to, to the blind spot that was pointed out with regard to Deputy Day. I thought it also made clear that different forms of screening, different protocols needed to be used with different forms of addiction. Your Honor, to, to my knowledge, uh, the only, the only evidence in the file on that point is the declaration by Dr. Lay, who, who tries to inform the court that let's not get hung up on the alcohol label that is put on the withdrawal protocol. It's, it's broader than that. It's alcohol. It's heroin. It's, it's a variety of substances that unfortunately inmates come in addicted to a variety of substances. And by the way, I understand you may not agree with Sandoval, but it is binding law on this court. And unfortunately, Judge Carney did not have the benefit of the law. No one called it en banc and there was no certification. So, uh, Your Honor, if I haven't said it, and if you don't know it, we have enormous respect for this court and the opinions that it issues. Sandoval had a great deal of scholarship involved. It was beautifully written. Um, but I, I, I, I can't agree with the level of generality that I saw, but now that it's out there, we'll follow it. Counsel Judge Gould to interject my concern. I shared the concern that was raised by Judge Wardlaw in, in her last comment. And so the question I have to you is, is there anything in our circuit opinion of Miller v. Gammie, which governs when we're bound by a circuit precedent and when it's been overruled, is there anything in that that would suggest that our panel is not bound by Sandoval, by that opinion? Because it looked to me like that's the law of the circuit that this panel needs to follow. Well, Your Honor, I'm unfamiliar with the Miller case. I, I am aware from my work as a lawyer that there is Ninth Circuit law saying that it is not always appropriate for one three-judge panel to attempt to overrule another three-judge panel. I am aware of that, but again, it all goes back to the level of generality that we're going to talk about. Sandoval, with great respect, it was not a heroin withdrawal case. It did talk about, and rightly so, how medical professionals, jail staff in general, can't ignore medical need, can't ignore medical needs. And so, with respect to Sandoval, I don't think that it governs here based, based on the record in our case where we have a medical doctor getting involved, not ignoring Mr. Gordon, but got involved and gave a treatment plan. Sandoval says itself, my reading of the case, is at page 680 on a jump site on the opinion. Sandoval makes an effort to distinguish it itself from a medical malpractice case. There's general agreement in the Ninth Circuit and elsewhere that garden variety medical malpractice is not actionable under the 14th Amendment, and that's in Gordon 1, which was written by Judge Gonzalez Rogers. Medical malpractice standing alone is not going to violate the 14th Amendment. You need to go to state court for that, cite state court law. So, in Sandoval, they talked about, we emphasize that this is not a case where a nurse mistakenly misdiagnosed the patient after reasonably attempting to ascertain the cause of unexplained symptoms. So, in Sandoval, there was no effort to treat the problem that in hindsight may have been done better. In Sandoval, the poor inmate was ignored, but that's not our case here. That's what separates our case out. The doctor made a call, the nurses then followed up on the call, and that brings me to another point in terms of clearly established law. Can I ask you a question? You indicated that you believe that there's a right to monitoring. In this case, the card that Gordon went into the chamber with indicated that he needed medical assistance. So, how do you reconcile the constitutional right with monitoring when you add in the component, right? This is a huge county jail, but not all county jails are that big, and there's this additional component where the doctor has indicated that he's under medical supervision, and the deputy understood that and knew that. So, isn't there then an objective standard of indicating that someone has the right to adequate monitoring while under medical supervision? Then it's a fact question, right? Then it's a fact question for the jury to decide whether or not that right was violated. Your Honor, this goes back again to the plaintiff's fundamental grievance with Dr. Lee. Dr. Lee could have sent Mr. Gordon to a hospital. He could have confined him to an infirmary at the factual application of the objective issue. What I'm concerned about is the articulation of the objective issue. So, whether or not plaintiffs have a quarrel with it is not in front of us. The question is, what's the objective standard? And that's what I'm trying to get you to focus on, right? Mr. Harrell, so I'm having the same problem. What I hear you arguing is, it's clearly established that there needs to be some adequate medical screening when there's suspicion of a problem, but in this case, that was done. And to me, that's not the qualified immunity argument. To me, that's the we go to trial argument. Well, Your Honor, I think it goes back to the clearly established law standard. All of these cases would go to trial, but for the second prong of qualified immunity, which gives protection to medical professionals, deputies, all public employees, allows them to do their job with guidance from supervising courts. And where a officer, they're entitled to do the best that they can without concern that they're going to be brought into court and subjected to a jury trial. And like I told the court, if in this case, the court feels that CEWA was not the right way to go, cows should have been used, hospitals should have been used, that Mr. Gordon should not have been in general housing, that he should have been in an infirmary. First of all, I believe that the court would be assisted by some type of medical expert from plaintiff saying that from a medical standpoint, the failure not to do any of these things is shocking. But they didn't have any expert come to the trial court. There's nothing in the record for this court saying that this is an egregious problem that this court needs to make a rule on. So you may be right. You may still prevail on the wrong, not on whether in fact it was violated. And he melded the facts into the clearly established, which is really a question of law. Right. And this court takes a de novo review of the matter. And it's up to this court, like it was with the 10th Circuit, to take a look at the national sweep. The 9th Circuit sweep is where we start, but even more broadly nationally, there just hasn't been guidance for the men and women in the medical profession that are in our jails in the 9th Circuit on whether or not they need to be the things that plaintiffs factually argue for in this case. And frankly, when it comes to qualified immunity, it's not what plaintiffs counsel, it's not what I think. It's what the courts have said needs to be done. And when the guidance is not there, qualified immunity says it's not a lawsuit. Plaintiffs should have, could have, I suppose, sued in state court law in state court. That, to get back to Judge Gonzalez-Rogers' phrasing, that's the heart of the issue here. This is a medical malpractice case. This isn't a 14th Amendment turning the tried. And that's what the 9th Circuit has said you need to do. And once you try, once you don't ignore them, and that was the Sandoval case. I mean, the facts were terrible. Somebody just got ignored. Nobody ignored anybody here. The 9th Circuit has said, don't do that. We have given that training to Orange County as if they need it. But we've given that training to Orange County and to our other clients and to their credit, nobody was ignored here. One of the things that separates this case out factually, and the court very helpfully sent out an order pre-argument that listed a number of cases that it wanted us to be ready to talk about. And one of the things that I was really struck by in those cases was oftentimes the deliberate indifference issue is appropriate for a jury when the inmate is complaining, saying, I need some help. And nobody does anything. That is clearly established law. And there were some pretty severe and troubling problems. There were gum infections, there were hip replacements that needed to happen. In one case, Building 8 in a jail had mentally ill inmates and they pulled everybody out for a staff meeting and then somebody got hurt. And our case is nothing like that. Our case is they made an effort and they tried and nowhere in the record, even once, is there any evidence that Mr. Gordon told the jail nursing staff, this is not working. I need something better. I need to go to the hospital. It's completely silent in that area. Sometimes the evidence comes before the court because other inmates fill out declarations saying this individual was in a bad way. They complained. I complained. There's nothing like that here. And so that does separate us out from Sandoval, which is binding precedent in our case. When the court takes another look at it, I think the court will see that Mr. Gordon was not ignored. Is the case tragic? Sure. But he was not ignored. All right. Thank you, counsel. We give you two and a half times your time. The court's been very generous with this time. The court's been very generous. We're trying to get to the bottom of all of these, the law here and all the crosshairs of the law. So thank you, Mr. Schlesinger. You're muted. Sorry about that, Your Honor. I would like to try in my limited time to address five points that it might bring me slightly over time. And with the court's indulgence, I'll try to do it as quickly as I can. First, Judge Werther is absolutely correct. As the opinion in Gordon 1 noted, the C.Y. Kyle's form, if you want to use the shorthands for those two forms, were changed. I'll note on page 1121 of Gordon 1, the plaintiff proffered evidence that the entity defendants did not use the Kyle's form systematically and changed their practice after Gordon's death. Second, addressing Judge Gould's point regarding Miller v. Gammey. Judge Gould is absolutely correct. Miller v. Gammey would bind this court, currently sitting as a three-judge panel, to follow Sandoval, which is, as Judge Werther and Judge Gould stated, is the law of the circuit at this point regarding qualified immunity. Three, my opposing counsel seems to make much of Dr. Lee's 11th hour declaration regarding why he used the C.Y. protocol. And at most for him and his clients, that creates a genuine issue of material fact regarding whether the course of treatment was medically unacceptable under the circumstances at the time. And I should note that simply because Dr. Lee was supervising Nurse Finley doesn't mean that she, as a licensed healthcare professional and registered nurse, had an obligation simply to blindly follow whatever he was doing. And indeed, as we discussed during this argument, she was the one who made the initial assessment using what we deemed to be the C.Y. protocol. And again, I'm going to try to be as quick as I can, Judge Werther. No, it's okay. Would you clarify the respective role of Dr. Lee? Because I understood from your opposing counsel that he was suggesting that Dr. Lee made the initial decision to follow the C.Y. What happened, and I think the opinion in quorum one demonstrates this or sets this out quite well on page 1121, it was originally Nurse Finley who used the C.Y. form to make the assessment. And then it was from that assessment using an incorrect form that Dr. Lee then, for whatever reason, he gave conflicting accounts both in his deposition testimony and then in his 11th declaration submitted during the briefing on remand in the district court. So Dr. Lee did ultimately make a medical decision, but it was based first on the screening that Nurse Finley had done using the correct form. And the two other quick points, if I may, and I appreciate the court's indulgence. Judge Werther was suggesting, I think, that the district court did not conduct the first prong analysis of qualified immunity, whether the four individual defendants that actually violated the 14th Amendment's due process clause. We think it would be appropriate for this court, in light of Cloutier, to go ahead and decide that point, that prong as well, if the court deems there to have been clearly established law. And that's because in Cloutier, the court, on its own initiative, decided qualified immunity in its entirety, even though the district court hadn't even reached that particular defense that the defendants in that case had asserted. So we think it would be entirely appropriate for the court to bound by the record at this point and think that a revamp is necessary to address the first prong. We would certainly agree to engage in that. And the last point is regarding opposing counsel's statements that Mr. Gordon hadn't voiced his concern to anyone in the facility regarding his treatment or lack thereof or condition. There's evidence in the record, and I believe it's even addressed in, I think it is addressed briefly on page 1121 of Gordon 1, that there was a fairly rigid jailhouse protocol regarding how the detainees were supposed to communicate with corrections officials, with the sheriff's deputies and with medical personnel. And so there was actually a fellow named David Maggar, who is a house mouse, so-called house mouse within that had to have communicated through David Maggar to give instructions to the deputies and to the medical personnel that he was in distress. So it's a little bit more convoluted and not as clear as Mr. Harrell suggests. I appreciate the court's indulgence in allowing me to get through all those points and for taking us over time. If there are no further questions, I would be prepared to submit. All right. Thank you very much, counsel, both of you for your excellent and helpful arguments. This session of the court is adjourned for today. This court for this session stands adjourned.
judges: Wardlaw, Gould, Rogers